IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| DENNIS WIERTELLA, *as Administrator of the Estate of Randy Wiertella, Deceased, and Father of Randy Wiertella*, | ) ) ) | CASE NO.  1:20-cv-2739 |
| | ) | JUDGE BRIDGET MEEHAN BRENNAN |
| Plaintiff, | ) ) | |
| v. | ) ) | **MEMORANDUM OPINION AND ORDER** |
| LAKE COUNTY, OHIO *et al.*, | ) ) | |
| Defendants. | ) ) | |

## I.     Introduction

Randy Wiertella ("Mr. Wiertella") died while in the custody of the Lake County Adult Detention Facility (the "Jail").  Dennis Wiertella ("Plaintiff"), as the administrator of Mr. Wiertella's estate, claims that Jail personnel failed to provide Mr. Wiertella with the medical care, prescriptions, and equipment his serious medical conditions required.  Plaintiff claims that the Jail's inadequate medical care resulted in Mr. Wiertella's death.

Plaintiff brought this suit under 42 U.S.C. § 1983 against certain Jail employees and other personnel alleging violation of Mr. Wiertella's rights under the Eighth and Fourteenth Amendments (Count One); a *Monell* claim against Lake County (Count Two); negligence against Lake County and certain Jail employees (Count Three); a wrongful death claim against Lake County and certain Jail employees (Count Four).  Defendant Dr. Karim Razmjouei, M.D. ("Dr. Raz")[1] and Defendants Lake County, Captain Cynthia Brooks, Lieutenant Benjamin

---

[1] Both Plaintiff's Complaint and Amended Complaint (Doc. Nos. 1, 7) use the name "Dr. Karim Razmjouei."  Dr. Raz legally changed his last name from Razmjouei to Raz.  (Doc. No. 70-5 at 3505.)  The Court will refer to Dr. Raz by his legal name.

Longbons,[2] Diane Snow, RN, and Christina Watson, RN (the "Lake County Defendants") moved for summary judgment on Plaintiff's claims.  (Doc. Nos. 48, 57.)  These motions are fully briefed.  (*See* Doc. Nos. 71, 72, 73.)  For the reasons below, Dr. Raz's motion is GRANTED, and the Lake County Defendants' motion is GRANTED in part and DENIED in part.

II.    **Factual Background**

A.  **Mr. Wiertella's Arrest**

Early on Sunday, December 2, 2018, Mr. Wiertella, a resident of Wisconsin, was pulled over for speeding on I-90 West in Willoughby Hills, Ohio.  (Doc. No. 57-2 at 1095.)[3]  He was found to be in possession of a loaded firearm and approximately one gram of cocaine.  (Doc. No. 71-3 at 5595-96.)[4]  On December 5, 2018, Mr. Wiertella was arraigned on one charge of possession of drugs and one charge of improper transport of a firearm.  (*Id.* at 5597.)  On that same day, Mr. Wiertella was sentenced to 27 days at the Jail.  (*Id.* at 5654.)

B.  **Medical Screening**

On December 2, 2018, Mr. Wiertella was booked at the Jail as a pretrial detainee. Lieutenant Longbons initiated the booking process.  (Doc. No. 70-4 at 3378.)  This process required medical screening, which included a series of 58 questions listed on a particular screening form.  (Doc. No. 71-4 at 5662-63 (medical screening form listing questions).)  Mr. Wiertella's form noted that he took medication for diabetes, heart disease, high blood pressure,

---

[2] Since December 2018, Benjamin Longbons was promoted from Sergeant to Lieutenant.  (Doc. No. 70-4 at 3321.)  The Court will refer to Lieutenant Longbons by his current title unless quoting a supporting document.

[3] For ease and consistency, record citations are to the electronically stamped CM/ECF document and PageID# rather than any internal pagination.

[4] Mr. Wiertella had a concealed carry permit.  (*See* Doc. No. 71-3 at 5595.)

and psychiatric disorders.  (*Id.*)  It also noted that Mr. Wiertella was allergic to Lisinopril,

required a diabetic diet, suffered from sleep apnea, and had concerns about his immune system.

(*Id.* at 5663.)  The form also reflected that Mr. Wiertella took medications that required

continuous administration.  (*Id.* at 5662.)[5]  Though the form prompted Lieutenant Longbons to

document the names of Mr. Wiertella's medications, the last time he took these medications, and

the timing of his next doses, these sections were left blank.  (*See id.* at 5663.)  Lieutenant

Longbons also filled out a separate form indicating that Mr. Wiertella did not have any

diagnosed food allergies.  (*Id.* at 5664.)

After the medical screening, but within forty-eight hours of the inmate's arraignment, the

Jail "classified" inmates into three groups: minimum security, medium security, or maximum

security.  (Doc. No. 70-4 at 3399-3401.)  The Jail used another form to aid in this process.  (*See

id.*)  On December 2, 2018, Lieutenant Longbons filled out the cover sheet of the Jail's

classification form.  (Doc. No. 71-3 at 5639 (showing Lieutenant Longbons' signature).)  Officer

Deanna Hill completed the remaining pages on the same day.  (*Id.* at 5639-47; Doc. No. 70-4 at

3405.)  After completing the booking process and initiating the classification paperwork,

Lieutenant Longbons had no further interaction with Mr. Wiertella.

The classification form included questions that are not covered by the medical screening

form, such as an inmate's history of education, employment, and military service.  (*See* Doc. No.

71-3 at 5645.)  Some questions on the classification form overlapped with questions posed to the

---

[5] On the medical screening form, question 17 is posed as a compound question: "Is the prisoner
carrying medications or does the prisoner report being on medication which should be
continuously administered or available."  (Doc. No. 71-4 at 5662.)  Lieutenant Longbons circled
"yes" in response to this question and clarified in his deposition testimony that he understood
Mr. Wiertella to be on medications that should be continuously administered or available.
Lieutenant Longbons further testified that he believed that Mr. Wiertella "did not bring any
medications with him to our facility."  (Doc. No. 70-4 at 3381-82.)

inmate during medical screening. These included, "are you taking any psychiatric medications?"; which psychiatric medications an inmate takes; and "did you bring in your medication?" (*Id.* at 5642.) Unlike the medical screening form, this classification form noted that Mr. Wiertella took Zoloft for depression. (*Id.*) It also indicated that Mr. Wiertella typically received his medications through the Veterans Affairs Department ("VA"). (*Id.* at 5643.) Mr. Wiertella was classified as minimum security. (*Id.* at 5647.)

Nurse Christina Watson reviewed Mr. Wiertella's medical screening form on December 2, 2018, the day Mr. Wiertella was booked. (*See* Doc. No. 70-8 at 4021-22.) The classification form that Lieutenant Longbons and Officer Hill completed was not part of Mr. Wiertella's medical file, and therefore was not sent to the Jail's medical staff. (*See id.* at 4036-37; Doc. No. 70-6 at 3803.) Nurse Watson signed the medical screening form and testified that she was aware that Mr. Wiertella was "on medications that needed to be continuously administered" for diabetes, heart disease, high blood pressure, and psychiatric disorders. She was also aware that he was booked without medications. (Doc. No. 70-8 at 4018-19, 4027; Doc. No. 70-14 at 4899.)

The Jail's policies set out a procedure for inmates who are booked without medications. Policy 254A identified certain examples of essential medications that included "antihypertensives (BP); cardiac medications, seizure medications, diabetic medications, blood thinners and antibiotics." (Doc. No. 70-12 at 4701.) This policy further stated that:

> If the inmate does not have any essential medications with him/her upon arrival, but states to the staff that he/she is on medications, the medical staff will contact the inmate's physician or pharmacy to confirm the essential medications, and make arrangements for its delivery to the facility.

(*Id.* at 4702.)[6]

---

[6] Excerpts from the Jail's policies retain the original headings, sections, subsections and formatting.

4

If the inmate does not have medications, but states that he/she is on medications, the inmate will be required to write down what the medication(s) are that they have been prescribed, who (what doctor) prescribed them, what pharmacy the medications were purchased from, and when was the last date and time they took the prescribed medications. Officers will [e]nsure that they note on the form the addresses and/or phone numbers associated with the doctor and pharmacy.

If the inmate cannot remember any of this information the inmate will be required to write down specifically that they do not have any information regarding the medications, and the statement will be witnessed by the officer.

If the medical staff is not on duty, and if there is no medical staff scheduled to be on duty within the next 15 hour period of the receipt of any medications by arriving inmates, then the medical staff will be contacted either at 0800 hrs or at 2200 hrs (which ever time comes first that particular day ) to review medication provided by inmates, during that particular shift, to make an evaluation concerning:

> a. If any of those medications are essential medications

> a. [*sic*] To make arrangements for the passing of any medications they determine to be essential to the individual inmate when the inmate has the medication present in the facility

> b. To make arrangements with the on-call physician to order the essential medications for delivery to the inmate

(*Id.*)

Nurse Watson and Nurse Diane Snow, the nursing coordinator, testified to the medical staff's practices when an inmate stated that he or she was on medications but did not have them upon entering the Jail. The medical staff's preference was that inmates ask their family or friends to bring their medications to the Jail, where the medications could be screened and administered. (Doc. No. 70-6 at 3721, 3766, 3770.)

If an inmate was unable to arrange a delivery, the medical staff's practice was to issue a prescription itself. (*Id.* at 3771.) The process of issuing a prescription depended on the information the inmate could provide. If the inmate could provide contact information for his doctor or pharmacy, the medical staff would obtain the necessary information to verify the prescription from with the pharmacy or physician. (*Id.* at 3777.) If the medical staff could not

obtain information from the inmate's pharmacy or physician, Nurse Snow testified that the inmate would be scheduled for physician "sick call."  (*Id.* at 3793-94.)

According to Nurse Watson, if an inmate could not provide a physician or pharmacy for the Jail to contact, the medical staff was not required to take further steps to identify and contact pharmacies or physicians, but might do so anyway. (Doc. No. 70-8 at 4012.)

Lieutenant Longbons testified that if an inmate did not know information about his medications or prescribing physicians, he was not required to have the inmate write down this information.  (Doc. No. 70-4 at 3376-77.)

Based on Mr. Wiertella's in-custody communications, he was capable of writing down his medications.  (*See* Doc. No. 71-4 at 5665-66 (listing medications).)  Mr. Wiertella also identified the Wassau VA as the pharmacy he typically used.  (*See id.* at 5665.)  However, Mr. Wiertella's medical screening form did not contain this information.  (*See id.* at 5662-63.) Despite the lack of prescription details, Mr. Wiertella was not asked to write down the information he had nor "write down specifically that [he did] not have any information regarding the medications" while being "witnessed by the officer" pursuant to the Jail's policies and procedures.  (Doc. No. 70-12 at 4702.)  There is no evidence that a nurse or any member of the medical staff attempted to verify Mr. Wiertella's medications.

## C.  Requests for Medications

On December 3, 2018, two of Mr. Wiertella's friends, Kurt Anthony Anton and Anthony Joseph Spatol, visited him at the Jail.  (Doc. No. 71-3 at 5656.)  Mr. Wiertella also made recorded calls to friends, family, and his public defender.  (*See* Doc. Nos. 57-3, 57-4, 57-5, 57-6.)  In these recordings, Mr. Wiertella requested help contacting the VA for a list of his

prescriptions.  (*See* Doc. Nos. 57-5, 57-3.)  Specifically on December 5, 2018, Mr. Wiertella asked an unidentified male

> Can you get with Jess and have her call the VA and get a list of all my prescriptions, because they're still having a hard time doing that down here, and I haven't been on any meds now for like four days, blood pressure or diabetes, nothing.  And they're saying it could be another week unless I get them that list, or get them sent in to me.

(Doc. No. 57-3 at 1099.)  Mr. Wiertella provided the unknown male with the name and contact information for his public defender.  (*See id.* at 1100.)  The next day, Mr. Wiertella spoke with an unidentified female and confirmed that the VA would have a list of his medications.  (*See* Doc. No. 57-6 at 1132-33.)  He instructed her to coordinate with his public defender regarding his medical needs.  (*See id.*)

Between December 3 and December 5, Mr. Wiertella sent a series of inmate request forms to Jail staff, colloquially referred to as "kites," asking for medication.  (*See* Doc. No. 70-14 at 4903-05.)

According to its policies, the Jail

> uses Inmate Request Forms for inmates to correspond, ask questions or make request from various personnel in the detention facilities.  These forms are available by request from the Correction Officers assigned to your housing area.  These forms are to be used to make request or communicate with the medical staff, mental health services, Jail Administrator, inmate programming, etc.

> Once the Inmate Request Form is received by personnel it will be answered by the proper authorities and returned to you with a reply.  Please limit each Inmate Request Form to having only one request.  Profanity on Inmate Request Forms is prohibited and will be subject to disciplinary action accordingly.  Frivolous request or those without your name will not be accepted.

(Doc. No. 70-12, at 4396.)

Policy 210C detailed a procedure for inmate request forms.  The relevant portions are excerpted below:

**PROCEDURE:**

1. Anytime an inmate requests an inmate request form, the officer will attempt to provide the inmate with one in a reasonable amount of time.

2. The officer providing the inmate request form should ask the inmate what his/her concern or request may be. This should be done to ensure the request is not an emergency.

3. If the issue is an emergency the officer should assess the issue and contact the appropriate personnel.

4. Non-emergency requests should be handled when the officer can reasonably provide the inmate a form.

**CONTROL:**

1.  All inmate request forms given to officers by inmates should be handled as quickly as possible.

2. The form provides an area for the name of inmate making the request, and where the inmate is located.

3. The form provides an area for the officer handling the inmate request form to sign the form
. . .

**ROUTING:**

1. Once the officer receives the completed Inmate request form, the officer will sign the form, and will give the inmate the pink copy of the initial request.
. . .
3. Any personnel or department that receives a forwarded inmate request form shall take the necessary steps to handle the request or issue and reply in the space provided.  The responding person will then sign and date their reply and return the inmate request form to the appropriate floor and inmate.
. . .

**TRACKING:**

1. Completed inmate request forms will be taken to Central Control and filed alphabetically in the records folder.  These forms will then be forwarded to the records department once per shift, unless otherwise requested, where they will be placed into the inmates personnel file.

2.  This is done to ensure the requests, issues and concerns of the inmates housed in the facility are recorded, and a written document can be called upon to prove or explain an action taken by corrections officers or other personnel of this facility.

(*Id.* at 4482-84.)

Policy 251 applied to kites raising an illness or injury:

1.  Inmates with claims of an illness or injury will be provided with an Inmate Request Form and will be advised to fill it out completely, including date and range.

    . . .

    b.  The correction officer will sign the form and add the inmate's range and cell number. The officer will review the form to ensure that the request is clear.

2.  If the correction[s] officer receiving the medical complaint feels it is necessary, medical staff should be notified immediately.

3.  For non-emergencies, the forms will be provided to the medical staff and the inmate scheduled to be examined.

    a.  The medical staff will execute the remainder of the form as it pertains to diagnosis, initial treatment and on-going treatment.

        •  All inmate medical Inmate Request Forms will be kept filed in the inmate's medical record and kept on file.

    b.  Medical forms will be reviewed daily.  This will be done by the physician or allied medical personnel in her absence.

    . . .

6.  The physician will report to the facility a minimum of four (4) days a week to examine inmates who have medical complaints filed, to examine inmates who are otherwise in need of medical care and to complete inmate physicals. The nursing staff will run sick call an additional 2 days per week. This will provide 6 days of coverage for inmate medical sick call.

(*Id.* at 4688-90.)

According to Nurse Snow, corrections officers typically collected kites during their shift work.  The corrections officers then delivered them to any one of four places: the medical staff at central booking, the medical staff's mailbox, the sergeant's office, or the clinic.  (Doc. No. 70-6 at 3734, 3774.)  She also recalled medical staff receiving kites directly from inmates.  (*Id.* at

3735-36.)  The nursing staff would check the sergeant's office and mailbox four to five times a shift.  (*Id.* at 3769.)  She also stated that the medical staff "really attempted to try and get a response to those requests within 24 hours if at all possible."  (*Id.* at 3739.)  Nurse Snow was unaware of any Jail policy mandating that the medical staff review an inmate's requests for medical care daily.  (*Id.* at 3738-39.)

On December 3, 2018, Mr. Wiertella sent his first kite.  (Doc. No. 70-14 at 4905.)  He requested "diabetic and other meds" as well as an extra mattress.  (*Id.*)  That same day, though not necessarily in response to Mr. Wiertella's kite, Nurse Watson ordered a diabetic diet, metformin, and daily glucose checks.  (*Id.* (showing signatures for both the responder and the officer giving reply to inmate); *id.* at 4899 (showing progress notes from medical staff); *id.* at 4907 (showing daily glucose checks from December 4-9, 2018); Doc. No. 70-8 at 4030-31.) During a recorded call, Mr. Wiertella mentioned receiving extra mattresses from Jail staff.  (Doc. No. 57-5 at 1129.)

Nurse Watson did not order any other medications for Mr. Wiertella on December 3, 2018, or at any other point during Mr. Wiertella's detention.  Nurse Watson testified that she treated Mr. Wiertella's diabetes, but she did not treat his other medical conditions.  (Doc No. 70-8 at 4025-26 ("I did what I was trained to do, was pulled out the [] most important which was [] him being a diabetic.").)  To her, she was trained to prioritize conditions like diabetes over other conditions like heart disease.  (*Id.*)  In contrast, Nurse Snow testified that she did not train Nurse Watson to treat diabetes to the exclusion of an inmate's other medical needs.  (Doc. No. 70-6 at 3815.)  Nurse Snow also testified that the Jail had no such policy regarding prioritization of medical conditions.  (*Id.*)

10

Also on December 3, Mr. Wiertella made a second request for "Prilosec, Saralitralen [sic], Lasics [sic], Efomefrion [sic] and, Simocoton [sic]," and indicated that the final three prescriptions were for blood pressure.  (Doc. No. 70-14 at 4904.)  Dr. Raz testified that Sertraline is an antidepressant like Zoloft and that Lasix is a diuretic used to treat high blood pressure.  (Doc. No. 70-5 at 3640-41.)  The kite was collected, but Mr. Wiertella did not receive a response.  (*See* Doc. No. 70-14 at 4904 (showing signature "of person receiving the request" but no signatures for responder or officer giving reply to inmate).)

On December 5, Mr. Wiertella made a third request, this time for an additional mattress and medications.  (*Id.* at 4903.)  Mr. Wiertella listed "Metformin, Prilosec, Saralitolen, Efomefrion, Lasices, Semecolon and water pills."  (*Id.*)  He also wrote "call Wausau VA to get full list of meds or my meds sheet."  (*Id.*)  Again, this kite was collected, but Mr. Wiertella did not receive a response.  (*See id.* (showing signature "of person receiving the request" but no signatures for responder or officer giving reply to inmate).)  Nurse Watson testified that she did not receive Mr. Wiertella's last two kites and did not deliberately ignore them.  (Doc. No. 70-8 at 4034.)  According to Nurse Watson, the medical staff "answer[ed] as many [kites] as we are capable of doing and sometimes, yes they do get backed up."  (*Id.*)  There is no record evidence that any member of the Jail's medical staff received, reviewed, or responded to either of Mr. Wiertella's final two kites.

Nurse Snow testified that the Jail scheduled medical sick calls for inmates with medical conditions or complaints.  (Doc. No. 70-7 at 3850-51.)  The medical staff operated two types of sick calls: physician sick calls and nurse sick calls.  (*Id.* at 3851.)  Physician sick calls included either Dr. Raz or the Jail's physician's assistant, who also had the authority to write prescriptions.  (*See id.* at 3929, 3954.)  In general, the nurses who managed nurse sick calls could

11

not prescribe medications.  (Doc. No. 70-6 at 3750; Doc. No. 70-5 at 3566 (explaining only

MDs, nurse practitioners, or physician assistants can prescribe medications).)  Nurse sick calls

occurred every day of the week, while physician sick calls occurred Monday through Friday.

(Doc. No. 70-7 at 3852.)  Mr. Wiertella was scheduled for a nurse sick call on December 10,

2018, for a blood pressure check.  (Doc. No. 71-1 at 4960.)

### D.  Mr. Wiertella's Death

On the evening of December 9, Mr. Wiertella played cards with other inmates.  (Doc. No.

71-3 at 5569.)  He spoke with several friends on the phone, stating that "everything is good."

(Doc. No. 57-5 at 1116.)  Mr. Wiertella appeared for 11:00 p.m. headcount.  (Doc. No. 71-3 at

5567.)  On December 10, around 2:00 a.m., a corrections officer observed Mr. Wiertella in his

bed.  (*Id.* at 5558.)  At 2:20 a.m., an inmate in a nearby cell reported hearing him use the

bathroom.  (*Id.*)  Around 2:43 a.m., another officer observed Mr. Wiertella lying on his back on

the floor, motionless.  (*See id.* at 5566, 5573, 5574.)  Corrections officers opened Mr. Wiertella's

cell, checked for a pulse, and began chest compressions.  (*Id.* at 5566.)  At 2:55 a.m., paramedics

arrived and took over CPR.  (*Id.*)  Mr. Wiertella was pronounced dead at 3:12 a.m. on December

10, 2018.  (*Id.*)

The county Medical Examiner concluded that "atherosclerotic and hypertensive

cardiovascular disease was the cause of Mr. Wiertella's death."  (Doc. No. 70-1 at 3015; Doc.

No. 70-16 at 4912.)  Plaintiff's expert, Dr. Jonathan Arden, opined that atherosclerotic disease

was likely very mild, and that hypertensive disease was a more significant cause of death.  (Doc.

No. 70-1 at 3015; Doc. No. 70-16 at 4912.)  Specifically, Dr. Arden concluded that "[b]ut for the

failure to provide [Mr. Wiertella's] medications and a CPAP machine, in my opinion, Mr. Wiertella would not have died how and when he did." (Doc. No. 70-16 at 4914.)[7]

### E.  Lake County's Death Investigation

Sergeant John Kelley of the Lake County Sheriff's Department was assigned to investigate Mr. Wiertella's manner of death.  (Doc. No. 70-3 at 3207.)[8]  Sergeant Kelley investigated whether there was evidence of criminal conduct and/or possible violations of the Jail's policies and procedures.  (*Id.* at 3207, 3213-14.)  Sergeant Kelley testified that "Captain Brooks [the Jail Administrator] would be the one to look over any policy and procedure violations." (*Id.* at 3209.)

Sergeant Kelley did not interview the Jail's corrections officers but instead relied on their written reports.  (*Id.* at 3211; *see* Doc. No. 71-3 at 5566-87.)  Sergeant Kelley did not interview the Jail's nurses or members of the medical staff.  (Doc. No. 70-3 at 3278.)[9]  Sergeant Kelley interviewed inmates who observed Mr. Wiertella on the night of his death.  *(Id.* at 3211.)[10]  He

---

[7] Defendants do not cite expert testimony in their motions for summary judgment or replies. Plaintiff cited and attached the deposition testimony of  Dr. Ilan S. Wittstein in his opposition to Defendants' motions for summary judgment.  (*See* Doc. No. 71 at 4938-39; *see also* Doc. No. 71-13.)  This opposition also challenges Dr. Wittstein's credentials as an expert.  (Doc. No. 71 at 4939.)  However, Plaintiff did not file a *Daubert* motion to disqualify Dr. Wittstein.

[8] Sergeant Kelley testified that Captain Walters assigned him to investigate Mr. Wiertella's death.  (Doc. No. 70-3 at 3207.)  Plaintiff alleged Captain Brooks assigned Sergeant Kelley to this investigation.  (Doc No. 71 at 4940.)

[9] Nurse Snow testified that she believed she was on vacation around December 9, 2018, and heard about Mr. Wiertella's death upon her return to the Jail.  (Doc. No. 70-6 at 3796.)  She further testified that she did not have formal discussions with Detective Kelley or Captain Brooks.  (*Id.*)

[10] Sergeant Kelley testified that one of the inmates he interviewed, Kevin Cole, informed Sergeant Kelley that he "heard Mr. Wiertella's blood pressure being checked two days before" Mr. Wiertella's death.  (Doc. No. 70-3 at 3251.)  Sergeant Kelley testified that Mr. Cole told him Mr. Wiertella's blood pressure was "through the roof."  (*Id.*)  However, Sergeant Kelley testified

had access to Mr. Wiertella's medical file. (*Id.* at 3245-47.) But Sergeant Kelley did not review certain pages of Mr. Wiertella's medical file from the Jail, including the second and third kites. (*Id.*) According to Sergeant Kelley, the fact that these kites were "received by a corrections officer, but nobody ever responded to them" was "problematic." (*Id.* at 3250.)

On February 21, 2019, Sergeant Kelley issued his report. He concluded "based on the evidence and coroner's report, Mr. Wiertella was found to have die[d] from natural causes" and recommended the matter be closed. (Doc. No. 71-3 at 5571.) The report did not state any conclusions of violations of the Jail's or Sheriff's policies, and Sergeant Kelley did not deliver his report to Captain Brooks directly. (*See id.*; Doc. No. 70-3 at 3251.)

## F. Captain Brooks

Captain Brooks worked for the Lake County Sheriff's Office for nearly forty years. (Doc. No. 70-2 at 3108.) Since 2011, Captain Brooks served as the Jail Administrator for the Jail. (*Id.* at 3108-09.) The Jail Administrator's responsibilities included hiring, training, overseeing the daily duties of the Jail's staff and conducting inspections. (*Id.* at 3110.)

Another function of the Jail Administrator was to ensure that the Jail's policies are up to date. (*Id.*) Captain Brooks, along with a team of officers and supervisors, conducted an annual

---

that he felt Mr. Cole had conflated blood pressure and blood sugar and noted that Mr. Cole could not tell him who took Mr. Wiertella's blood pressure or where that check took place. (*Id.* at 3267-68.) After receiving this information from Mr. Cole, Sergeant Kelley did not conduct further investigation into Mr. Wiertella's blood pressure because he reasoned that considering Mr. Wiertella's daily glucose checks, "if he did have real high blood pressure, then it should have been annotated in his chart . . . ." (*Id.* at 3269.)

Plaintiff cites this testimony only in relation to the Lake County Sheriff Department's allegedly deficient investigation into Mr. Wiertella's death. (*See* Doc. No. 71 at 4941). Plaintiff does not rely on this testimony to support his claims of deliberate indifference to a serious medical need. Accordingly, the Court will not consider this testimony for anything beyond the facts it is cited to support, nor examine whether Mr. Cole's statement would be admissible.

review of the Jail's policies. (*Id.* at 3120-21.) Additionally, every employee was asked to read and review the Jail's policies. (*Id.* at 3121.) For the Jail's medical policies, the Jail Physician, Dr. Raz, was tasked with reviewing these policies and, when necessary, suggesting revisions. (*Id.* at 3119-20.)

Captain Brooks testified that the Jail had a standard policy of conducting investigations when inmates passed away while in custody. (*Id.* at 3134.) To Captain Brooks, the purpose of Sergeant Kelley's investigation was to determine whether Mr. Wiertella's death was "natural or suicide or some other suspicious reason that needed further investigation." (*Id.* at 3135.) There was no specific investigation into the medications Mr. Wiertella received, the communications between the nursing staff and Dr. Raz, or the medical care Mr. Wiertella received while at the Jail, though she believed Sergeant Kelley's investigation may have touched on these issues. (*Id.* at 3139-42.)

### G. Dr. Raz

Dr. Raz worked as a full-time physician at University Hospitals. (Doc. No. 70-5 at 3507.) Starting in 2017 or 2018, Dr. Raz also assumed the position of Jail Physician. (Doc. No. 71 at 4948; Doc. No. 70-5 at 3520; Doc. No. 70-2 at 3118.) Dr. Raz stated that his duties as Jail Physician included seeing patients two times a week for four hours each and answering nurses' calls. (Doc. No. 70-5 at 3521, 3602.) Dr. Raz further explained that while he did not create the Jail's policies and procedures, he did "look at it every year." (*Id.* at 3524.) During his deposition, he did not recall reviewing some of the Jail's policies presented to him. (*Id.* at 3531.)

Dr. Raz thought the Jail nurses and/or a nursing coordinator, were in charge of medical care. (*Id.* at 3535.) To his understanding, the nurses identified which patients he would see when he was present at the Jail. (*Id.* at 3537.) Dr. Raz relied on the information the nurses

relayed to him.  (*Id.* at 3538; 3544; *see also* Doc. No. 70-6 at 3787.)  Dr. Raz could ask to see any patient about whom he had questions.  (Doc. No. 70-5 at 3537.)  He did not review medical screening forms or order sheets unless prompted by the nurses.  (*Id.* at 3538-40.)  Dr. Raz testified that if he reviewed an order sheet for a medication and nothing seemed out of the ordinary, it was not his practice to review the inmate's entire medical file.  (*Id.* at 3553.)

Dr. Raz was not responsible for training the Jail's medical staff.  (*Id.* at 3605-06.)  At most, Dr. Raz showed the medical staff certain procedures so that they could work alongside him comfortably.  (*Id.* at 3606.)

At no point during Mr. Wiertella's time at the Jail did Dr. Raz treat, see, or meet Mr. Wiertella.  (*Id.* at 3517.)  Instead, Dr. Raz had only indirect contact with Mr. Wiertella when he countersigned an order to fill a prescription for metformin for Mr. Wiertella on December 4, 2018.  (*Id.* at 3552; Doc. No. 70-14 at 4899 (showing Dr. Raz's signature on order for metformin).)  Dr. Raz likewise did not review Mr. Wiertella's medical screening form, the kites Mr. Wiertella sent, or any other documentation relating to Mr. Wiertella.  (Doc. No. 70-5 at 3617, 3605, 3549.)

### III.   <u>Procedural Background</u>

On December 9, 2020, Plaintiff filed this lawsuit naming Lake County Ohio, Sheriff Dan Dunlap, Captain Cynthia Brooks, Lieutenant Michelle Prather, Lieutenant Benjamin Longbons, Lieutenant Scott Simpson, Lieutenant Mark Soeder, Lieutenant Eric Vanjo, Sergeant Martin Bontrager, Sergeant Matthew Darone, Sergeant Diana Marino, Sergeant Michael Nohorniak, Sergeant Matthew Paul, Sergeant Terry Tarone, Dr. Karim Razmouei [sic], Nurse Diana [sic] Snow, Nurse Erin Boyle, Nurse Patty Hammers, Nurse Sabrina Watson, Nurse Christina Watson and various Doe Defendants.  (Doc. No. 1.)

16

On February 10, 2021, Plaintiff filed an Amended Complaint and a joint motion to dismiss Defendant Erin Boyle.  (Doc. No. 7.)  On February 11, 2021, the Court granted the joint motion to dismiss.  (Doc. No. 9.)  That same day, Defendants Bontrager, Brooks, Darone, Dunlap, Hammers, Longbons, Marino, Mahorniak, Paul, Prather, Simpson, Snow, Soeder, Tarone, Vanjo, Christina Watson, and Sabrina Watson answered.  (Doc. No. 11.)  Dr. Raz answered on March 17, 2021.  (Doc. No. 16.)  Following a case management conference on April 20, 2021 (Doc. No. 23), the parties engaged in discovery.

On April 4, 2022, Dr. Raz filed a motion for summary judgment.  (Doc. No. 48.)  On June 13, 2022, Plaintiff moved to dismiss Defendants Dunlap, Prather, Simpson, Soeder, Vanjo, Bontrager, Darone, Tarone, Marino, Nahorniak, Paul, Hammers, Sabrina Watson, and the Doe Defendants, which the Court granted on June 15, 2022.  (Doc. No. 56.)  On June 14, 2022, the remaining Lake County Defendants (Lake County, Captain Brooks, Lieutenant Longbons, Nurse Snow, and Nurse Watson) moved for summary judgment.  (Doc. No. 57.)  Plaintiff filed a consolidated opposition on July 14, 2022 (Doc. No. 71), and Defendants replied on July 28, 2022.  (Doc. Nos. 72, 73.)

## IV.    <u>Standard of Review</u>

"A party may move for summary judgment, identifying each claim or defense – or the part of each claim or defense – on which summary judgment is sought."  Fed. R. Civ. P. 56(a).  "Summary judgment is appropriate only if the pleadings, depositions, answers to interrogatories, and affidavits show there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  The moving party bears the burden of showing that no genuine issues of material fact exist."  *Williams v. Maurer*, 9 F.4th 416, 430 (6th Cir. 2021) (citations and quotations omitted); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

A "material" fact is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  And a genuine dispute of material fact exists if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  *Abu-Joudeh v. Schneider*, 954 F.3d 842, 849-50 (6th Cir. 2020) (additional citations and quotations omitted).

"Once the moving party satisfies its burden, the burden shifts to the nonmoving party to set forth specific facts showing a triable issue of material fact." *Queen v. City of Bowling Green, Ky.*, 956 F.3d 893, 898 (6th Cir. 2020) (quotation and citations omitted).  "[O]n summary judgment the inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion." *United States v. Diebold*, 369 U.S. 654, 655 (1962); *see also Kalamazoo Acquisitions, L.L.C. v. Westfield Ins. Co.,* 395 F.3d 338, 342 (6th Cir. 2005).

A party asserting (or disputing) a fact must cite evidence in the record or show that the record establishes the absence or the presence of a genuine dispute.  *See* Fed. R. Civ. P. 56(c) and (e).  Rule 56 further provides that "[t]he court need consider only" the materials cited in the parties' briefs.  Fed. R. Civ. P. 56(c)(2); *see also Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989) ("The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.").

"Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  However, the Court's role is not to make credibility determinations or 'weigh' conflicting evidence. *Payne v. Novartis Pharms. Corp.*, 767 F.3d 526, 530 (6th Cir. 2014); *Arban v. W. Pub. Corp.*, 345 F.3d 390, 400 (6th Cir. 2003).  "The ultimate

question is whether the evidence presents a sufficient factual disagreement to require submission

of the case to the jury, or whether the evidence is so one-sided that the moving parties should

prevail as a matter of law." *Payne*, 767 F.3d at 530.

**V.     Analysis**

    **A.  Count One**

        **1.  Overview of Claim**

    Plaintiff alleged he is entitled to relief against all individual Defendants under 42 U.S.C.

§ 1983.  (Doc. No. 7 at 136.)[11]  "To state a claim under § 1983, a plaintiff must allege the

violation of a right secured by the Constitution and laws of the United States and must show that

the alleged deprivation was committed by a person acting under the color of state law."  *West v.*

*Atkins*, 487 U.S. 42, 48 (1988).  Here, there is no dispute that Defendants were acting under color

of state law.

    The right at issue in Count One is the state's "constitutional obligation to provide medical

care to those whom it detains."  *Griffith v. Franklin Cnty., Ky.*, 975 F.3d 554, 566 (6th Cir.

2020).  The constitutional right to adequate medical care is rooted in the Fourteenth Amendment

for pretrial detainees and the Eighth Amendment for convicted prisoners.  *Johnson v. Karnes*,

398 F.3d 868, 873 (6th Cir. 2005) ("The right to adequate medical care is guaranteed to

convicted federal prisoners by the Cruel and Unusual Punishment Clause of the Eighth

Amendment, and is made applicable to convicted state prisoners and to pretrial detainees (both

---

[11] Plaintiff alleged Count One "[a]gainst [a]ll Defendants."  (Doc. No. 7 at 135.)  Yet, Plaintiff
only discussed Lake County in the context of his *Monell* claim (Count Two).  (*See* Doc. No. 71
at 4953.)  This makes sense because claims against local governing bodies are governed by
*Monell*.  *See Johnson v. Hardin Cnty., Ky.*, 908 F.2d 1280, 1285 (6th Cir. 1990).  In line with
Plaintiff's opposition brief, the Court therefore construes Count One as against all Defendants
besides Lake County.

federal and state) by the Due Process Clause of the Fourteenth Amendment."). It is undisputed that the Eighth and Fourteenth Amendments are implicated here because Mr. Wiertella was a pretrial detainee and a convicted prisoner during his time at the Jail. (Doc. No. 48 at 340; Doc. No. 57-1 at 1079; Doc. No. 71 at 4929.)

Defendants raised the defense of qualified immunity. (*See* Doc. No. 48 at 339-342; Doc. No. 57-1 at 1086-87.) "Qualified immunity protects state officers against section 1983 claims unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was clearly established at the time of the offense. And the burden lies with the plaintiff to show each prong." *Novak v. City of Parma, Ohio*, 33 F.4th 296, 303 (6th Cir. 2022) (quotations and citations omitted), *cert. denied*, 143 S. Ct. 773 (2023). Courts are permitted to "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

*Lawler v. Hardeman County, Tennessee*, 93 F.4th 919 (6th Cir. 2024) instructs district courts to start with the second qualified immunity prong. In *Lawler*, the court recognized that the Sixth Circuit clarified that Fourteenth Amendment and Eighth Amendment claims concerning the adequacy of medical care are governed by different standards. *Id.* at 927-28. But the court noted that this change did not occur until 2021, at the earliest. *Id.* at 927. Before 2021, both Eighth and Fourteenth Amendment claims were governed by *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). Because the challenged conduct in *Lawler* occurred in 2018, the court held that, under the second prong qualified immunity prong, *Farmer*'s standard governed the Fourteenth Amendment claims. *Id.* at 927-28. The court reasoned that qualified immunity "seeks to give officials 'fair notice' about when their actions will subject them to liability[,] [a]nd

officers will obviously lack notice of future rules that a court has yet to adopt." *Id.* at 926 (citations omitted).

Count One alleged that Defendants' 2018 conduct violated Mr. Wiertella's constitutional right to adequate medical care. (Doc. No. 7 at 129-30, 135-36.) Thus, under *Lawler*, *Farmer* governs Count One's Eighth and Fourteenth Amendment components. *Lawler*, 93 F.4th at 927-28. In *Farmer*, the Supreme Court held that "a prison official violates the Eighth Amendment only when two requirements are met." 511 U.S. at 834. First, "the deprivation alleged must be, objectively, sufficiently serious," which requires that an inmate show "he is incarcerated under conditions posing a substantial risk of serious harm." *Id.* (internal citations and quotations omitted). Second, an inmate must show that a prison official had a "sufficiently culpable state of mind." *Id.* Specifically, this state of mind must be "'deliberate indifference' to inmate health or safety." *Id.*

The first *Farmer* prong, the objective component, requires the plaintiff to demonstrate that the inmate had an "objectively serious medical need." *Grote v. Kenton Cnty., Ky.*, 85 F.4th 397, 405 (6th Cir. 2023). An objectively serious medical need includes "conditions that have been diagnosed by a physician as mandating treatment" or are "so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Harrison v. Ash*, 539 F.3d 510, 518 (6th Cir. 2008) (quoting *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 897 (6th Cir. 2004)).

The second *Farmer* prong, the subjective component, mandates the plaintiff "prove that an officer knew of the facts creating the substantial risk of serious harm" and "that the officer believed that this substantial risk existed." *Lawler*, 93 F.4th at 929 (citing *Farmer*, 511 U.S. at 837.) Moreover, "even if the officer knows of a substantial risk, the inmate must lastly show that the officer 'responded' to the risk in an unreasonable way." *Id.* (citing *Farmer*, 511 U.S. at 844

21

and *Beck v. Hamblen Cnty.*, 969 F.3d 592, 601-02 (6th Cir. 2020)).  Because the Court "cannot

'impute knowledge from one defendant to another,'" the Court "must 'evaluate each defendant

individually.'"  *Greene v. Crawford Cnty., Mich.*, 22 F.4th 593, 607 (6th Cir. 2022) (quoting

*Speers v. Cnty. of Berrien*, 196 F. App'x 390, 394 (6th Cir. 2006)).

As a final point, Plaintiff must do more than simply apply *Farmer* to overcome the

second prong of qualified immunity:

> Clearly established law may not be defined at such a high level of generality. It
> must be more particularized than that.  The Supreme Court recently reminded us
> that a plaintiff must identify a case with a similar fact pattern that would have given
> fair and clear warning to officers about what the law requires.  Immunity protects
> all but the plainly incompetent or those who knowingly violate the law.  The
> dispositive inquiry is whether it would be clear to a reasonable officer that his
> conduct was unlawful in the situation he confronted.

*Arrington-Bey v. City of Bedford Heights*, 858 F.3d 988, 992-93 (6th Cir. 2017).  In other words,

Plaintiff must identify a case that provided notice to Defendants that their conduct would not

pass muster under *Farmer*.  *See id.*

## 2. Objective Component

There is no dispute here that Plaintiff established the objective component for all

Defendants.  The Lake County Defendants did not dispute that Mr. Wiertella had an objectively

serious medical need.  (Doc. No. 57-1 at 1079.)  Dr. Raz likewise did not dispute that Mr.

Wiertella had an objectively serious medical need.  (*See* Doc. No. 48 at 341-45 (challenging the

subjective component of Plaintiff's claim, but not the objective component).)

At the time of his death, Mr. Wiertella had several conditions that had been diagnosed by

a physician as mandating treatment, including type 2 diabetes mellitus, hypertension,

hyperlipidemia, obstructive sleep apnea, morbid obesity, orthopedic issues, chronic pain

syndrome, anxiety, depression, attention deficit disorder and post-traumatic stress disorder. (Doc. No. 70-16 at 4911; *see* Doc. No. 70-18.)

Accordingly, the Court finds that it was clearly established that Mr. Wiertella's medical conditions were objectively serious.  Next, the Court considers whether there is a triable issue of fact on the subjective component for each Defendant.  *See Greene*, 22 F.4th at 607.

### 3.  Captain Brooks and Dr. Raz

Plaintiff's Section 1983 claims against Captain Brooks and Dr. Raz fail because there is no evidence that they were subjectively aware that Mr. Wiertella's serious medical needs went untreated.  *See, e.g.*, *North v. Cuyahoga Cnty.*, 754 F. App'x 380, 388-89 (6th Cir. 2018); *Rouster v. Cnty. of Saginaw*, 749 F.3d 437, 453 (6th Cir. 2014); *Cesal v. Moats*, 851 F.3d 714, 723 (7th Cir. 2017).

Captain Brooks testified that she "supervised" the Jail's medical staff and ensured the medical policies were updated.  (Doc. No. 70-2 at 3112.)  She stated that she was not privy to any conversations concerning Mr. Wiertella's medical needs.  (*Id.* at 3141.)  Plaintiff did not dispute this testimony.  (*See* Doc. No. 71 at 4951-52.)  In short, there is no evidence that Captain Brooks was aware of Mr. Wiertella's medical conditions – let alone that these conditions were serious and not being treated.

Dr. Raz testified that he had a single instance of indirect contact with Mr. Wiertella: he reviewed and countersigned an order for a prescription for metformin and ordered a diabetic diet and daily glucose checks on December 4, 2018.  (*See* Doc. No. 70-14 at 4899.)  Dr. Raz did not review any inmate medical screening forms and was, therefore, unaware that Mr. Wiertella had any conditions besides diabetes.  (*See* Doc. No. 70-5 at 3552.)  Again, Plaintiff did not dispute this testimony.  (*See* Doc. No. 71 at 4948-51.)  Dr. Raz's testimony is also corroborated by Nurse

Snow's testimony that she did not give Dr. Raz medical screening forms.  (Doc. No. 70-6 at 3787.)

To the extent that Plaintiff seeks to hold Captain Brooks or Dr. Raz liable under a theory of supervisory liability, he must show that they "either encouraged the specific incident of misconduct or in some other way directly participated in it."  *Heyerman v. Cnty. of Calhoun,* 680 F.3d 642, 647 (6th Cir. 2012) (quotation marks omitted).  He may also prevail if he shows that Defendants "abandon[ed] the specific duties of his position in the face of actual knowledge of a breakdown in the proper workings of the department."  *Winkler v. Madison Cnty.*, 893 F.3d 877, 898 (6th Cir. 2018) (cleaned up).  As shown above, Plaintiff has not established that either Captain Brooks or Dr. Raz had sufficient involvement with Mr. Wiertella to "encourage" or "directly participate" with his medical treatment.  *Heyerman*, 680 F.3d at 647.  Nor has Plaintiff established that these Defendants had "actual knowledge of a breakdown in the proper workings of the [medical] department" to sustain an abandonment claim.  *Winkler*, 893 F.3d at 898.

Accordingly, Count One is dismissed against Captain Brooks and Dr. Raz.

### 4.  Lieutenant Longbons, Nurse Watson, and Nurse Snow

Unlike the other individual Defendants, Lieutenant Longbons, Nurse Watson, and Nurse Snow knew of Mr. Wiertella's serious medical needs.

To start, it is undisputed that Lieutenant Longbons completed Mr. Wiertella's medical screening form.  (Doc. No. 70-4 at 3378.)  Lieutenant Longbons, therefore, understood that Mr. Wiertella was taking medications for heart disease, high blood pressure, and psychiatric disorders.  (*See* Doc. No. 71-4 at 5662-63.)

It is also undisputed that Nurse Watson reviewed and signed Mr. Wiertella's medical screening form on December 2, 2018.  (Doc. No. 70-8 at 4018-19, 4027; Doc. No. 70-14 at

4899.) Nurse Watson knew that Mr. Wiertella was booked without the medications discussed on the screening form. (Doc. No. 70-8 at 4027; Doc. No. 70-14 at 4899.) A jury could reasonably find that Nurse Watson reviewed Mr. Wiertella's first kite. (Doc. No. 70-14 at 4899, 4905; Doc. No. 70-8 at 4031.) Thus, for summary judgment purposes, not only was Nurse Watson aware that Mr. Wiertella was booked without his heart disease, high blood pressure, and psychiatric disorder medications, but she was also aware of his explicit request for "diabetic and other meds." (Doc. No. 70-14 at 4905.)

A jury could find that Nurse Snow also reviewed Mr. Wiertella's medical screening form. Plaintiff cites Nurse Watson's testimony that the nursing staff would review and sign medical screening forms and place them on a shelf "for Diane [Snow] to review when she came in." (Doc. No. 70-8 at 3965.) The Lake County Defendants respond that Nurse Watson only stated that Nurse Snow reviewed *some* of the medical screening forms. (Doc. No. 73 at 5945.) But they did not provide any evidence that Mr. Weirtella's file was not placed on Nurse Snow's shelf for review. (*See id.*) Absent such evidence, the Court must draw the reasonable inference that Mr. Wiertella's form was one of the forms placed on the shelf for Nurse Snow's review. *See Richmond v. Huq*, 885 F.3d 928, 942-43 (6th Cir. 2018) (concluding, for summary judgment purposes, a doctor reviewed the inmate's medical history even though it was "not clear from the record whether [the doctor] actually reviewed that particular document").[12] Consequently, for summary judgment purposes, Nurse Snow was subjectively aware that Mr. Wiertella was booked

---

[12] A reasonable reading of Nurse Watson's testimony is that she placed screening forms on the shelf to determine whether an inmate needed a physical. (*See* Doc. No. 70-8 at 3965-68.) Based on this testimony and the length of Mr. Wiertella's detention, Mr. Wiertella would have needed a physical. (*Id.* at 3967.)

without medications that needed to be continuously administered to treat his serious medical needs.

Being aware of a serious medical need is not enough, though.  Plaintiff must also show that these Defendants "responded in an unreasonable way" after learning of Mr. Wiertella's medical conditions.  *Lawler*, 93 F.4th at 929.

To be sure, Lieutenant Longbons did not provide the medical staff with the names of Mr. Wiertella's medications.  (Doc. No. 71-4 at 5662-63.)  This question was listed on the medical screening form and was also required by the Jail's policies and procedures.  (*Id.*; Doc. No. 70-12 at 4702.)  But the Sixth Circuit has already recognized that Lieutenant Longbons' conduct was not constitutionally unreasonable.  *See Brawner v. Scott Cnty., Tennessee*, 14 F.4th 585, 600 (6th Cir. 2021) (holding that "to the extent the booking officer incorrectly recorded answers or failed to contact the medical staff, that at most reflects negligent conduct") ; *see also Graham ex rel. Estate of Graham v. Cnty. of Washtenaw*, 358 F.3d 377, 384 (6th Cir. 2004) (holding it is not "unconstitutional for municipalities and their employees to rely on medical judgments made by medical professionals responsible for prisoner care" (quotations omitted)).[13]  Here, Lieutenant Longbons was reasonable in his expectation that medical personnel would follow up.  At most, his conduct was negligent.  (Doc. No. 70-4 at 3371-73.)  Accordingly, Count One is dismissed against Lieutenant Longbons.

---

[13] *Brawner* was decided in 2021, several years after the events in this case.  However, in *Brawner*, the Sixth Circuit applied the Fourteenth Amendment's "reckless disregard" standard for the officer's subjective intent. *See* 14 F.4th at 596-97.  Because the Sixth Circuit has held that a booking officer's failure to accurately record answers or contact medical staff is merely negligent, these actions cannot meet the higher standard for deliberate indifference applicable to this case.

Given their specialized training and knowledge of Mr. Wiertella's medical needs, Plaintiff asserted that Nurse Watson and Nurse Snow unreasonably failed to ensure Mr. Wiertella obtained medications other than metformin.  (*See* Doc. No. 71 at 4944-46.)  Defendants countered that Plaintiff cannot prevail because there is not "a single case inside or outside the Sixth Circuit in which a defendant was found liable for being deliberately indifferent to an inmate who did not first exhibit or complain of symptoms."  (Doc. No. 57-1 at 1082.)  Thus, to Defendants, because Nurse Watson and Nurse Snow neither met Mr. Wiertella nor heard him complain of physical symptoms, Plaintiff cannot show that they violated a clearly established right.  (*See id.* at 1082, 1086-87.)[14]

*Richmond v. Huq*, 885 F.3d 928 (6th Cir. 2018) – which was cited in Plaintiff's opposition brief – provides that a jury could find that Nurse Watson's and Nurse Snow's failure to take steps to obtain Mr. Wiertella's medications violated Mr. Wiertella's constitutional right to adequate medical care under *Farmer*.  (Doc. No. 71 at 4943.)  And, as explained below, *Richmond* is a "similar fact pattern that would have given [Nurse Watson and Nurse Snow] a fair and clear warning" that they had to do more to ensure that Mr. Wiertella obtained the essential medications that they knew Mr. Wiertella was taking.  *Arrington-Bey*, 858 F.3d at 993.  Thus, a jury could find that Nurse Watson and Nurse Snow violated Mr. Wiertella's clearly established rights.  *See id.*[15]

---

[14] Defendants assert that Nurse Snow is not liable in her supervisory capacity.  (Doc. No. 57-1 at 1083-84.)  Because this Court has determined that there are material issues of fact surrounding Nurse Snow's knowledge of Mr. Wiertella's medical needs and that these fact issues preclude a grant of summary judgment on Count One as it relates to Nurse Snow, the Court declines to consider the viability of the supervisory liability aspect of Count One against Nurse Snow.

[15] The *Richmond* defendants' motion for rehearing *en banc* was denied on May 17, 2018.  *Richmond* was stablished law before the events that gave rise to this action.

The plaintiff in *Richmond* was arrested on December 25, 2012, but was immediately taken to the hospital for a self-inflicted burn wound.  885 F.3d at 934.  On December 26, 2012, the plaintiff arrived at the jail.  *Id.*  One of the defendant nurses noted that the plaintiff was on Prozac and Xanax and that her last dose of these medications was on December 25, 2012.  *Id.* at 934-35, 941.  The plaintiff informed the nurse that she was being treated at a mental health facility.  *Id.* at 946.  The nurse recommended that a psychiatric social worker meet with the plaintiff.  *Id.*  On December 28, 2012, one of the doctor defendants saw the plaintiff.  *Id.* at 935.  The doctor treated her burn and scheduled a follow-up appointment on January 10, 2013.  *Id.* at 935, 942.  Also on December 28, 2012, a social worker defendant spoke with the plaintiff.  *Id.* at 935.  During this appointment, the social worker learned about the plaintiff's "prior history of bipolar disorder and her then-current medications[,] which included Prozac and Xanax."  *Id.*  The social worker scheduled the plaintiff to see a psychiatrist on January 11, 2013.  *Id.*  The social worker also determined that the plaintiff was stable enough to be without her psychiatric medications until her appointment.  *Id*.

The plaintiff did not receive psychiatric medication until January 14, 2013, twenty days after her confinement began.  *Id.* at 943.  Because of this delay, the court held that the nurse's, the doctor's, and the social worker's conduct constituted deliberate indifference under *Farmer*.  *Id.* at 937-38, 941-43, 946.

Regarding the nurse, the court held that simply recommending that the plaintiff meet with a psychiatric social worker was insufficient.  *Id.* at 946.  Instead, she should have attempted to verify the plaintiff's statements about her medications and mental health treatment by contacting the pharmacy or the mental health facility.  *Id.*  The court rejected the nurse's assertion that these facilities might have been closed when she met with the plaintiff because the nurse did not

contact one of these places when they were open or recommend that another nurse reach out to them later.  *Id.*

As to the doctor, the court held that because the plaintiff's medical file indicated that she was taking psychiatric medications, the doctor had an affirmative duty "to ensure that [the plaintiff] received her medication, such as prescribing them herself or even simply requesting that a nurse check with [the plaintiff's] outside doctor or pharmacy to verify her prior prescriptions." *Id.* at 942.  Because the doctor's appointment with the plaintiff was on December 28, 2022, simply waiting for the plaintiff to have her psychiatric mediations addressed at the January 11, 2013 psychiatrist appointment was not enough.  *See id.* at 935, 941-42.

Lastly, the court found that the social worker's determination that the plaintiff was stable enough to be without medications was constitutionally unreasonable.  *Id.* at 942.  In support of this finding, the court noted that the social worker testified that if a person taking the plaintiff's medications suddenly stopped taking them, they would place themselves at immediate risk of experiencing depression and mood oscillations.  *Id.*  With this testimony, the court held that on December 28, 2012, the social worker had to do more than schedule the plaintiff to see a psychiatrist on January 11, 2013.  *Id.* at 943.

All in all, *Richmond* provided notice that when a medical employee at a jail becomes aware that an inmate is on medication for a serious medical condition, a defendant violates the constitution if she fails to promptly take steps to ensure that the inmate's medication is obtained. *See id.* at 935-44.  Notably, the court in *Richmond* determined that the doctor had sufficient awareness of the plaintiff's medications because she had access to the plaintiff's medical records and an opportunity to review them.  *Id.* at 935, 941-42.  The *Richmond* opinion does not state

that the plaintiff alerted the doctor of her need for medications or exhibited symptoms.  *See id.*

Instead, the appointment only concerned the plaintiff's burn wound.  *See id.* at 935.

Moreover, the only defendants the court found were not deliberately indifferent to the

plaintiff's need for medications were those who acted immediately or knew that immediate

action would be taken.  Specifically, one defendant social worker who heard the plaintiff's

complaints about not receiving her medications referred the plaintiff for a mental health

screening, which seemingly occurred on the same day.  *Id.* at 935, 943-44.  The court also found

that another doctor who met with the plaintiff on the day of her psychiatric appointment was not

deliberately indifferent because there was no evidence he could have provided the plaintiff with

medication any sooner than the facility's psychiatrist.  *Id.* at 941.

The Court compares Nurse Watson's and Nurse Snow's conduct to that of the *Richmond*

defendants.

*Nurse Watson.*  On December 2, 2018, after reviewing Mr. Wiertella's medical screening

form, Nurse Watson became aware that Mr. Wiertella was booked without his heart disease, high

blood pressure, and psychiatric disorder medications and that these medicines "needed to be

continuously administered."  (Doc. No. 70-8 at 4018-19, 4027; Doc. No. 70-14 at 4899.)  There

is no evidence that Nurse Watson did anything to obtain these medications that day.  On

December 3, 2018, Nurse Watson learned that Mr. Wiertella requested "diabetic and other

meds."  (Doc. No. 70-14 at 4899, 4905; Doc. No. 70-8 at 4031.)  The only action Nurse Watson

took on this day was to order Mr. Wiertella a diabetic diet, the diabetes medication metformin,

and daily glucose checks.  (Doc. No. 70-8 at 4031.)  Otherwise, she took no steps to obtain the

heart disease, blood pressure, or psychiatric medications stated on the medical screening form.

She did not attempt by to locate Mr. Wiertella's outside doctor or pharmacy to verify his prior

prescriptions.  Nor did she attempt to determine what "other meds" referred to in Mr. Wiertella's first kite.  Finally, there is no evidence that Nurse Watson was ever aware that Mr. Wiertella was scheduled for a sick call and blood pressure check on December 10, 2018 – let alone that she was the employee who scheduled him for this appointment.  (*See* Doc. No. 71-1 at 4960; Doc. No. 70-7 at 3865.)

Nurse Watson's conduct was clearly insufficient under *Richmond*.  To start, Nurse Watson became aware that Mr. Wiertella's need for medications in the same manner as the doctor in *Richmond*: from a medical file.  (Doc. No. 70-14 at 4901.)  But, unlike the *Richmond* doctor, Nurse Watson was reminded again that Mr. Wiertella was on medications after she reviewed his first kite.  (Doc. No. 70-14 at  4899, 4905,4907; Doc. No. 70-8 at 4031.)  Further, like the social worker in *Richmond*, Nurse Watson cannot claim that she was unaware that going without medications for blood pressure and heart disease would put Mr. Wiertella at risk, as she testified that she knew that they were essential medications.  (Doc. No. 70-8 at 4008-09; *see also id.* at 4041-42 (stating it concerned her that inmates were not obtaining blood pressure promptly).)[16]  She also understood these medications to be essential medications from her review of the Jail's policies.  (*Id.* at 3987; Doc. No. 70-12 at 4701.)  Despite this knowledge, Nurse Watson failed to take any steps to ensure that Mr. Wiertella obtained these medications.  The failure to take any action regarding Mr. Wiertella's medications – without knowing that Mr. Wiertella would eventually see a medical professional – is more severe than the nurse's doctor's, and social worker's unconstitutional conduct in *Richmond*.  *See* 885 F.3d at 935-44.

---

[16] More to the point, Defendants conceded that the medical conditions that Plaintiff claims caused Mr. Wiertella's death, *i.e.*, his hypertension, was an objectively serious medical need. (Doc. No. 57-1 at 1079.)

31

*Nurse Snow.*  For summary judgment purposes, Nurse Snow became aware that Mr. Wiertella was booked without medications as early as December 2, 2018.  (Doc. No. 70-14 at 4901.)  Nurse Snow, like Nurse Watson, knew that Mr. Wiertella's medications were essential under the Jail's policies.  (Doc. No. 70-6 at 3728.)  In fact, Nurse Snow testified that Nurse Watson was incorrect to prioritize Mr. Wiertella's diabetes medication over those for heart disease and blood pressure.  (*Id.* at 3815.)  Yet, the record indicates she did nothing to secure Mr. Wiertella's non-diabetes medications.  Thus, under *Richmond*, a jury could thus find her liable.

As a final point, even if the Court assumed that either Nurse Snow or Nurse Watson scheduled Mr. Wiertella for the nurse sick call or that they were aware of this appointment, a jury could still find their actions deliberately indifferent.  As an initial matter, this appointment was scheduled eight days after Mr. Wiertella was booked without his medications.  A jury could find that this appointment was not the prompt response required by *Richmond*.  Moreover, a jury could scrutinize the decision to schedule Mr. Wiertella for a nurse sick call rather than a physician sick call, which could have occurred as early as December 3, 2018.  (*See* Doc. No. 70-7 at 3852-53.)  According to the record, determinations regarding the types of medications an inmate would receive could only occur at physician sick calls.  (Doc. No. 70-6 at 3750; Doc. No. 70-5 at 3566.)  Thus, it is unclear that Mr. Wiertella would have obtained his medications at his sick call on December 10, 2018.  Notably, Nurse Snow testified that when an inmate could not provide the names of his medications or pharmacy, that inmate should be for a physician sick call, not a nurse sick call.  (Doc. No. 70-6 at 3793-94; *see also* Doc. No. 70-12 at 4702.)

For these reasons, a jury could reasonably conclude that Nurse Watson's and Nurse Snow's conduct constituted deliberate indifference.  Summary judgment on Count One as it relates to Nurse Watson and Nurse Snow is denied.

### 5.  Causation

The Lake County Defendants challenge Plaintiff's ability to establish the causation component of a Section 1983 claim.  (*E.g.*, Doc. No. 73 at 5941-42.)  As stated above, the Court has determined that a jury could find that Nurse Watson and Nurse Snow violated Mr. Wiertella's constitutional right to adequate medical care by failing to take steps to secure his continued access to necessary medications.  The Court must now determine whether a jury could reasonably conclude that this failure caused Mr. Wiertella's death.

To succeed on a Section 1983 claim, a "plaintiff must establish that the defendant's constitutional violation was the proximate cause of his injury."  *Hickerson v. Koepp*, 107 F.3d 11 (Table), 1997 WL 56591, at *3 (6th Cir. Feb. 10, 1997); *see Horn by Parks v. Madison Cnty Fiscal Court*, 22 F.3d 653, 659 (6th Cir. 1994) ("[P]roximate cause is an essential element of a § 1983 claim for damages.") (citing *Doe v. Sullivan Cnty, Tenn.*, 956 F.2d 545, 550 (6th Cir. 1992), *cert denied*, 506 US. 864 (1992)); *see also Deaton v. Montgomery Cnty, Ohio*, 989 F.2d 885, 889 (6th Cir. 1993) ("Congress did not intend § 1983 liability to attach where causation is absent.").

"[T]o establish causation in the § 1983 context, a plaintiff 'need only demonstrate a link between each defendant's misconduct and [the plaintiff's] injury.'"  *Roberts v. Coffee Cnty., Tenn.*, 826 F. App'x 549, 554 (6th Cir. 2020) (quoting *Clark Murphy v. Foreback*, 439 F.3d 280, 292-93 (6th Cir. 2006)).  Thus, courts in this circuit have "framed 'the §1983 proximate-cause question as a matter of foreseeability, asking whether it was reasonably foreseeable that the complained of harm would befall the 1983 plaintiff as a result of the defendant's conduct.'"  *Id.* (quoting *Powers v. Hamilton Cnty. Pub. Def. Comm'n*, 501 F.3d 592, 609 (6th Cir. 2017)).  "[P]roximate causation, or the lack of it, is generally a question of fact to be decided by a jury,

unless the evidence is such that a reasonable person could reach only one conclusion." *Id.* (alterations and internal citations omitted) (citing *Toth v. Yoder Co.*, 749 F.2d 1190, 1996 (6th Cir. 1984) and *Pierce v. United States*, 718 F.2d 825, 829 (6th Cir. 1983)).

Here, Plaintiff introduced expert testimony from Dr. Arden regarding Mr. Wiertella's cause of death.  (*See* Doc. No. 70-16.)  Dr. Arden opined that because Mr. Wiertella did not receive medications to treat his blood pressure, psychological conditions, chronic pain, obstructive sleep apnea, or hypertension, "his blood pressure would have increased" and "he would have experienced multiple events of decreased or absent breathing, with lowered oxygen saturation, during sleep."  (*Id.* at 4913.)  Dr. Arden opined that "[i]ncreased blood pressure and diminished oxygenation increase the risk of having a sudden cardiac event, including sudden death."  (*Id.*)  In sum, Dr. Arden concluded that "but for the failure to provide those medications and a CPAP machine, in my opinion, Mr. Wiertella would not have died how and when he did." (*Id.*)

The Lake County Defendants assert that Dr. Arden's report is insufficient to establish causation for two reasons.

First, the Lake County Defendants argue, without evidence, that Plaintiff has not shown that Mr. Wiertella was taking his medications prior to his incarceration.  The them, that renders Dr. Arden's opinions regarding discontinuation of medication "speculative and inadmissible." (Doc. No. 57-1 at 1077.)   But evidence of Mr. Wiertella's pre-detention reliance on medications was provided.  Plaintiff directs the Court to the medical screening form. As the summary judgment movant, the Lake County Defendants have not met their burden.

Second, the Lake County Defendants assert that Dr. Arden's report does not state that "*Defendants'* acts and omissions were a proximate cause of [Mr.] Wiertella's death."  (*Id.*

34

(emphasis in original).) Not so. If a jury accepted Dr. Arden's opinion that not having his essential medications led to increased blood pressure and decreased oxygen levels, which in turn increased the likelihood of a cardiac event and sudden death, a jury could reasonably conclude there is a sufficient "link between each defendant's misconduct and [the plaintiff's] injury." *Roberts*, 826 F. App'x at 554. (Doc. No. 70-16 at 4913.)

At this stage, Plaintiff has met his burden of establishing a fact question as to whether Nurse Watson's and Nurse Snow's conduct proximately caused Mr. Wiertella's death.

### B. Count Two

Claims against Lake County, along with the claims against Defendants in their official capacities, are analyzed under *Monell v. New York City Department of Social Services*, 436 U.S. 658 (1978). *Kentucky v. Graham*, 473 U.S. 159, 166 (1985) ("As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity.").

*Monell* provides that a county can be liable for a constitutional violation under Section 1983 in limited circumstances. 436 U.S. at 690-91. A county is only liable when its policy or custom caused the plaintiff's injury. *Id.* at 694. "A plaintiff . . . must identify the policy, connect the policy to the County itself and show that the particular injury 'was incurred because of the execution of that policy.'" *Graham ex rel. Est. of Graham*, 358 F.3d at 382 (quoting *Garner v. Memphis Police Dep't*, 8 F.3d 358, 364 (6th Cir. 1993)) (brackets removed). There are four primary paths to establish *Monell* liability: "(1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of

a custom of tolerance [of] or acquiescence [to] federal rights violations." *D'Ambrosio v. Marino*, 747 F.3d 378, 386 (6th Cir. 2014).

Plaintiff presents four theories of *Monell* liability in opposition to summary judgment. (*See* Doc. No. 71 at 4953-57.) The Court addresses each theory.

### 1. Inadequate Training and Supervision

A county's "culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to supervise or train." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). To meet this demanding standard, the plaintiff must establish either: "(1) a pattern of similar constitutional violations by untrained employees or (2) a single violation of federal rights, accompanied by a showing that [the county] has failed to train its employees to handle recurring situations presenting an obvious potential for a constitutional violation." *Helphenstine v. Lewis Cnty. Ky.*, 60 F.4th 305, 323 (6th Cir. 2023) (quotations omitted).

Here, Plaintiff did not attempt to prove a pattern of similar constitutional violations by untrained Lake County employees. (*See* Doc. No. 71 at 4955.) He must therefore establish that this case fits within the "narrow range of circumstances[] where a federal rights violation" is "a highly predictable consequence of a failure to equip [employees] with specific tools to handle recurring situations." *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 409 (1997). In *Arrington-Bey*, the court made clear that this burden can only be met if the plaintiff can show that it was "clearly established" that the county's training and supervision was constitutionally inadequate when the alleged violation occurred. 858 F.3d at 994-95. This is so because the plaintiff's burden is to show that the county was deliberately indifferent to his constitutional right, and a county cannot "*deliberately* shirk a constitutional duty unless that duty is clear." *Id.* at 995 (emphasis in original).

36

The clearly established inquiry requires the Court to consider whether a previously-decided case provided Lake County with a "clear and fair warning" that its training and supervision created an obvious potential for Mr. Wiertella to experience a deprivation of a constitutional right. *Id.* at 993 (quoting *White v. Pauly*, 580 U.S. 73, 79 (2017)). Thus, the Court considers Sixth Circuit cases finding a *Monell* defendant's training and supervision at a jail was patently inadequate, subjecting it to liability without a pattern of similar constitutional violations.

*Shadrick v. Hopkins County, Kentucky*, 805 F.3d 724 (6th Cir. 2015) explains the minimum medical training and supervision a county must provide to ensure inmates' constitutional rights are protected. In *Shadrick*, the court held that numerous employees' failures to treat an inmate's MRSA infection, ultimately causing the inmate's death, created a triable issue as to whether the corporation operating the jail was liable under *Monell*. *Id.* at 728-29. The court highlighted three inadequate areas in the jail's operations, which, considered collectively, a jury could find amounted to deliberate indifference to inmates' serious medical needs. *See id.* at 740-41.

First, the jail's medical staff consisted of LPNs with minimal medical training and limited medical skills. *Id.* at 740. The plaintiff's expert testified that "LPN nurses lack[ed] any authority to diagnose medical conditions."[17] *Id.* The only other medical professionals remotely associated with the jail were a doctor and an RN. *Id.* at 733-35. Despite serving as the jail's "Medical Director," the doctor "denied any responsibility for training or supervising" the LPNs and "characterized himself as a consultant." *Id.* at 733. The RN visited the jail "once every two

---

[17] Plaintiff's expert report offered no opinion on the training and supervision of the medical employees at the Jail. (*See* Doc. No. 48-9.) The Sixth Circuit has suggested that expert testimony may be necessary to sustain a failure to train and supervise claim. *Griffith v. Franklin Cnty., Ky.*, 975 F.3d 554, 580 (6th Cir. 2020); *Russo v. City of Cincinnati*, 953 F.2d 1036, 1047 (6th Cir. 1992).

to three months for four hours or less and sometimes conducted audits." *Id.* at 734.  She did not

"ordinarily" train nurses and was unfamiliar with the jail's policies and procedures.  *Id.*

Second, the LPNs received virtually no on-the-job training.  *Id.*  at 740.  The court found

that there was "no proof of a training program that was designed to guide LPN nurses in

assessing and documenting medical conditions of inmates, obtaining physician orders, providing

ordered treatments to inmates, monitoring patient progress, or providing necessary emergency

care to inmates within the jail environment in order to avoid constitutional violations."  *Id.*  The

only training the LPNs received was "some limited on-the-job training when beginning their

employment, such as learning where supplies were kept . . . ."  *Id.*

Third, the LPNs were unaware of and did not follow the jail's policies and procedures.

"The nurses professed ignorance of written medical treatment protocols and policies purportedly

drafted by [the *Monell* defendant] to guide their conduct."  *Id.*  Nor did the LPNs receive

supervision or feedback on whether their conduct comported with the jail's policies.  *Id.*  In fact,

the LPNs "followed an undocumented policy and custom of providing medical assistance only if

an inmate asked for it, despite the existence of written policies, procedures, and treatment

protocols mandating that nurses take particular actions at particular times."  *Id.* at 741.

Building off *Shadrick*, the Sixth Circuit recently found that there was a triable failure to

train and supervise *Monell* claim against a county despite the plaintiff not providing other

instances of similar constitutional violations.  *Helphenstine*, 60 F.4th at 326.  The jail in

*Helphenstine* had no medical staff present besides a doctor who, at most, visited the jail once a

week. *Id.* at 312.  Viewed in a light favorable to the plaintiff, the court found that jail employees

had no medical training beyond first aid and CPR.  *Id.*  Despite this lack of training, the county

"effectively asked the [employees] to make determinations about what constituted a medical

emergency." *Id.* at 325.  And the only medical professional involved with the jail was unaware of any of the jail's policies and procedures, including policies ensuring that jail staff tended to the inmate's medical emergencies.  *Id.*

Neither *Shadrick* nor *Helphenstine* clearly establish that Lake County's training and supervision was so "obviously" inadequate in 2018 as to amount to deliberate indifference.  *See Arrington-Bey*, 858 F.3d at 995.

Start with the Jail's staffing.  The medical team consisted of multiple RNs and LPNs who attended to inmates' medical needs seven days a week.  (Doc. No. 70-8 at 3926, 3934; Doc. No. 70-6 at 3749-50.)  Five days a week, the jail would also have a doctor or a physician assistant present.  (Doc. No. 70-7 at 3852-53.)  The Jail did not lack medically trained personnel like in *Shadrick* and *Helphenstine*.

Looking next at the Jail's training of medical staff, Nurse Snow testified that it was her responsibility to train new nurses.  (Doc. No. 70-6 at 3779-80.)  Nurse Watson testified that she trained with Nurse Snow for several weeks when she began working at the Jail.  (Doc. No. 70-8 at 3985.)  This training included setting up and performing inmate sick calls, ordering medications, attending medical calls, and inspecting and processing medications.  (*Id.* at 3985-86.)  Again, this undisputed testimony does not establish that the Jail's medical staff was essentially untrained as in *Shadrick* and *Helphenstine*.  *See Winkler*, 893 F.3d at 904-05 (finding that a jail's initial one-on-one training of medical staff and group training sessions several times a year was significantly more substantial than the training the LPNs received in *Shadrick*).

Finally, consider the Jail's policies and procedures.  Nurse Watson testified that she received a copy of the Jail's policies when she began working.  (Doc. No. 70-8 at 3987.)  Nurse Watson was aware of changes to the Jail's policies and procedures.  (*Id.* at 3988-98.)  Nurse

Snow testified that all nurses were expected to understand the Jail's policies and procedures. (Doc. No. 70-6 at 3780-81.) Lieutenant Longbons testified that corrections officers and supervisors were expected to understand and follow the Jail's policies and procedures. (Doc. No. 70-4 at 3344.) He also stated that employees were periodically required to review the policies and answer questions to test their comprehension. (*Id.* at 3339-40.) Although the record does not establish that Dr. Raz reviewed all the Jail's medical policies and procedures, it does indicate they were reviewed by other medical professionals. (*See, e.g.*, Doc. No. 70-5 at 3531; Doc. No. 70-2 at 3112.) Nurse Snow also testified that she would suggest changes to the Jail's medical policies and procedures to Captain Brooks. (Doc. No. 70-6 at 3731-32.) Put simply, unlike *Shadrick* and *Helphenstine*, there is undisputed record evidence that the Jail's employees were aware of and expected to follow the Jail's governing policies and that medical professional reviewed the medical policies.

The Court finds that Lake County's training and supervision was not so insufficient in December 2018 as to constitute deliberate indifference. But this finding should not be read as an endorsement of Lake County's training and supervision. Troublingly, Lake County appeared to have policies and procedures in place that, if followed, might have saved Mr. Wiertella's life. Had a Jail employee made arrangements with the physician to review Mr. Wiertella's need for medications, he would have had an opportunity to obtain his medications well before he passed away. (*See* Doc. No. 70-6 at 3793-94; *see also* Doc. No. 70-12 at 4702.) The same is true if Mr. Wiertella's last two kites had been promptly delivered to and reviewed by a medical professional.[18] (*See* Doc. No. 70-12 at 4688-90.) Finally, had Nurse Watson and Nurse Snow

---

[18] Notably, Ohio Admin. Code § 5120:1-8-09(H)(4) demands that medical kites be "[r]eviewed daily by qualified health care personnel . . . ."

treated Mr. Wiertella's blood pressure medicine as an essential medication, as required by the Jail's policies, these medications might have been delivered promptly with his diabetes medication. (*See id.* at 4701.) These actions were unfortunately not taken. This case has elucidated a clear need for additional training on and review of the Jail's policies and procedures – especially as they relate to essential medications.[19] All the Court has found is that the training, supervision, and policies *in 2018* were not so insufficient as to "present[] an obvious potential for a constitutional violation." *See Helphenstine*, 60 F.4th at 323 (quotations omitted).

## 2. Final Policymaking Authority

Plaintiff argues that Nurse Snow and Nurse Watson had final policymaking authority over the Jail's medical policies, subjecting Lake County to liability for their actions. (Doc. No. 71 at 4954.) Regarding Nurse Watson, Plaintiff asserts that her decision not to order all Mr. Wiertella's medications and timely schedule him for an appointment with a physician constitutes official municipal policy. (*Id.*) Plaintiff also asserts that Nurse Snow's direction to Nurse Watson to prioritize Mr. Wiertella's diabetes over his other illnesses (including his high blood pressure) can also be attributed to Lake County. (*See id.* at 4954-55.)

A county is generally not liable under Section 1983 for the decisions of its officers. *See Pembaur v. City of Cincinnati,* 475 U.S. 469, 478 (1986). But when an allegedly unconstitutional decision is made by an official with "final policy making authority," the county may be held liable for that official's decision if the decision was made by "the official or

---

[19] Dr. Raz's acknowledged failure to review all the Jail's medical policies and procedures may have violated Ohio law. *See* Ohio Admin. Code § 5120:1-8-09(A)(1)-(5). Dr. Raz's failure to determine the appropriateness of clinical care and ascertain whether corrective action in the Jail's policies, procedures, or practices is warranted in light of Mr. Wiertella's death may have also violated Ohio law. *See* Ohio Admin. Code § 5120:1-8-09(AA).

officials responsible under state law for making policy in *that area* of the [county's] business." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988) (emphasis in original).

"Although it is true that final policymaking authority may be delegated, it is equally true that 'mere authority to exercise discretion while performing particular functions does not make a municipal employee a final policymaker unless the official's decisions are final and unreviewable and are not constrained by the official policies of superior officials.'" *Miller v. Calhoun Cnty.*, 408 F.3d 803, 814 (6th Cir. 2005) (quoting *Feliciano v. City of Cleveland*, 988 F.2d 649, 655 (6th Cir. 1993)) (citation omitted).  In other words, for a county to be liable for an employee's actions under *Monell*, the employee must have been delegated with the unconstrained ability to make unreviewable decisions regarding a subject matter.  *See, e.g.*, *Perrino v. City of Newton Falls*, 972 F.2d 348 (Table), 1992 WL 197328, at *5 (6th Cir. Aug. 14, 1992).  This means that a county is not liable for its employee's actions if the employee only has discretion to make decisions within the confines of a superior's policies or supervision.  *See, e.g.*, *id.*

Plaintiff has not shown that a jury could reasonably find that Nurse Watson and Nurse Snow had final policymaking authority.  Specifically, Captain Brooks testified that her role was to review the Jail's policies.  (Doc. No. 70-2 at 3110.)  Concerning the Jail's medical policies, Captain Brooks stated that she would only establish or alter existing medical policies with approval from Dr. Raz and the Sheriff.  (*Id.* at 3126.)  To the extent that this testimony established Captain Brooks had final policymaking authority over the Jail's medical policies, there is no evidence that she delegated this authority to Nurse Snow or Nurse Watson.[20]  Nurse

---

[20] Although the Court need not decide this issue because Plaintiff has not alleged that Captain Brooks' actions directly caused any injury, the Court is doubtful that Captain Brooks had final decision-making authority.  Her testimony indicates that the Sheriff had to approve all changes to

Snow testified that she made "suggestions" regarding the Jail's policies and procedures, which either Dr. Raz or Captain Brooks considered.  (Doc. No. 70-6 at 3730-31.)  Nurse Snow did not testify, however, that she had final authority over the Jail's medical policies or that her adherence to them was optional.  (*See id.*)  Nothing in Nurse Watson's testimony established that she had final policymaking authority.  In fact, her discretionary authority was cabined by Nurse Snow's orders.  (Doc. No. 70-8 at 4029.)

At most, Plaintiff has established that Nurse Watson and Nurse Snow had considerable discretion to make initial determinations on the type of care inmates received, such as when inmates' conditions warranted a physician sick call.  (*E.g.*, Doc. No. 70-8 at 3995; Doc. No. 70-6 at 3782.)  But granting employees the ability to exercise this type of professional discretion was not a delegation of final policymaking authority over the Jail's medical policies.  *See, e.g.*, *Miller*, 408 F.3d at 818 (holding that a doctor's actions could not be attributed to the municipality because the doctor merely possessed discretionary power to make decisions concerning specific inmates' medical needs); *Jorg v. City of Cincinnati*, 145 F. App'x 143, 147 (6th Cir. 2005) (coroner's authority to make determinations on causes of death was not final policymaking authority).

### 3.  Inaction

Plaintiff also attempts to establish *Monell* liability based on Dr. Raz's and Captain Brooks' inaction.  (Doc. No. 71 at 4954.)  Specifically, he faults both for

> fail[ing] or refus[ing] to develop and enforce multiple policies, including those to (1) identify serious medical issues and needs with the Jail; (2) adequately and timely communicate information related to serious medical needs; (3) objectively

---

the Jail's existing policies and procedures.  (Doc. No. 70-2 at 3126.)  This suggests that her authority to set and review the Jail's policies was not "unreviewable" and unconstrained by superior officials.  *Adair v. Charter Cnty. of Wayne*, 452 F.3d 482, 493 (6th Cir. 2006) (quoting *Waters v. City of Morristown*, 242 F.3d 353, 362 (6th Cir. 2001)).

investigate incidents of in-custody death; (4) comply with the statutory guidelines for protecting individuals in Jail custody; (5) respond to health complaints on a timely basis as required by law.

(Doc. No. 71 at 4954.)

To establish *Monell* liability for inaction, the plaintiff must show:

(1) a "clear and persistent" pattern of unconstitutional conduct by municipal employees; (2) the municipality's "notice or constructive notice" of the unconstitutional conduct; (3) the municipality's "tacit approval of the unconstitutional conduct, such that [its] deliberate indifference in [its] failure to act can be said to amount to an official policy of inaction"; and (4) that the policy of inaction was the "moving force" of the constitutional deprivation, such that the plaintiff's constitutional injury was directly caused by the conduct of the municipality rather than simply by the conduct of the municipal employee.

*D'Ambrosio*, 747 F.3d at 387-88 (quoting *Doe v. Claiborne Cnty.*, 103 F.3d 495, 508 (6th Cir. 1996)); *see also Stewart v. City of Memphis, Tenn.*, 788 F. App'x 341, 349-47 (6th Cir. 2019).

Here, Plaintiff has not met his burden. He has put forth no evidence establishing the first element, namely that there was a "clear and persistent" pattern of unconstitutional conduct by Jail employees. (*See* Doc. No. 71 at 4955 (plaintiff choosing not to prove his failure to train and supervise claim based on the occurrence of other constitutional violations in the Jail).) As such, Lake County cannot be held liable for its inaction. *See Stewart*, 788 F. App'x at 347 (noting that failing to prove one element causes an inaction *Monell* claim to fail).

### 4.  Custom

Plaintiff did not identify any illegal policy that caused Mr. Wiertella's death. (*See* Doc. No. 71 at 4953-56.) He does, however, suggest that there are customs that can be imputed to Lake County, such as the failure to properly address medical kites and the prioritization of diabetes medications. (*See* Doc. No. 71 at 4953 (asserting that Lake County's "Customs

44

Deprived Wiertella of His Constitutional Rights"); *id.* at 4955 (arguing that the Jail ignored Mr.

Wiertella's kites for blood pressure medication and, in doing so, violated the Ohio Rev. Code).)[21]

Under Section 1983, a custom "is a legal institution that is permanent and established[]

but is not authorized by written law." *Feliciano*, 988 F.2d at 655.  For a custom to give rise to

*Monell* liability, the custom "must 'be so permanent and well settled as to constitute a custom or

usage with the force of law.'"  *Miller*, 408 F.3d at 815 (quoting *Claiborne Cnty.*, 103 F.3d at

507).

Here, Plaintiff has not established the existence of any unwritten Jail practice or policy

that is "so permanent and well settled as to constitute a custom or usage with the force of law."

*Id.* (quotations omitted).  Accordingly, Plaintiff's final theory of *Monell* liability fails.  *See*

*Gregory v. Shelby Cnty., Tenn.*, 220 F.3d 433, 442 (6th Cir. 2000) (rejecting a *Monell* illegal

custom claim because the plaintiff did not provide evidence that the practice frequently occurred

outside of the events giving rise to his claim).

### C.  Counts Three and Four

Plaintiff also brought state law claims for negligence and wrongful death against

Defendants Lake County, Capitan Brooks, and Lieutenant Longbons.  (Doc. No. 7 at 141, ¶¶ 56-

---

[21] Plaintiff also seems to suggest that the Jail's policy of not providing inmates with CPAP machines can be imputed to Lake County.  (*See* Doc. No. 71 at 4936-37, 4956-57.)  It is undisputed that Mr. Wiertella did not receive a CPAP machine while he was at the Jail.  (*See* Doc. No. 70-8 at 3955 (testifying the Jail typically did not issue CPAP machines); *see also* Doc. No. 57-6 at 1134 (December 6, 2018 Transcript of call between Mr. Wiertella and unknown female stating "I do not have my CPAP machines").)  However, Plaintiff has not introduced evidence showing that Mr. Wiertella requested a CPAP machine from the Jail or anyone else. (*See* Doc. No. 57-6 at 1334 (discussing CPAP machines and stating "I'm not going to go there"); *see also* Doc. No. 70-14 at 4903-05 (not requesting CPAP machines).)  Nor has Plaintiff argued that refusing to provide a CPAP machine – absent an explicit request – is a facially illegal policy or custom.  For that reason, the Court will not analyze whether Lake County's policy or custom towards CPAP machines gives rise to a *Monell* policy or custom claim.

67.)  In their motion for summary judgment, the Lake County Defendants moved for summary judgment solely on state law statutory immunity grounds.  (Doc. No. 57-1 at 1089-91.)  In his opposition, Plaintiff did not contest that Lake County and Captain Brooks are statutorily immune.  (Doc. No. 71 at 4957 n.8.)  As such, summary judgment is warranted on Counts Three and Four of the Amended Complaint with respect to Lake County and Captain Brooks.

Consequently, the only remaining contested issue is whether Lieutenant Longbons is entitled to statutory immunity under Ohio law for the state tort claims brought against him. Plaintiff argues that for the same reasons a jury could conclude that Lieutenant Longbons was deliberately indifferent, "a jury could reasonably conclude that [Lieutenant] Longbons acted recklessly in failing to record essential medication information for [Mr.] Wiertella." (*Id.* at 4957-58.)  Plaintiff argues that because Lieutenant Longbons knew that Mr. Wiertella's health conditions constituted serious medical conditions under the Jail's policies and procedures and that serious medical harm or death could occur if Mr. Wiertella's medications were not administered, Lieutenant Longbons' mental state "meets the definitions of wanton and reckless conduct under Ohio law and immunity should not apply." (*Id.* at 4958.)

On the other hand, the Lake County Defendants argue that "[f]or the same reasons [Lieutenant] Longbons was not deliberately indifferent to [Mr.] Wiertella's serious medical need," he is statutorily immune from liability under Ohio Rev. Code § 2744.03(A)(6).  (Doc. No. 73 at 5950.)  The Lake County Defendants emphasize that Lieutenant Longbons "did not act or fail to act with malicious purpose, in bad faith, or in a wanton or reckless manner." (*Id.* (quoting *Est. of Overbey v. Licking Cnty., Ohio,* No. 2:13-cv-0671, 2015 WL 1611163, at *12 (S.D. Ohio Apr. 10, 2015).)  The Lake County Defendants also cite case law suggesting that even if the Court were to find Lieutenant Longbons liable for deliberate indifference, he would still be

46

entitled to statutory immunity for these claims because "the threshold for liability appears to be slightly higher under Ohio law than the deliberate indifference threshold for liability under § 1983." (*Id.*)

Ohio law immunizes the conduct of an employee of a political subdivision unless that conduct is "outside the scope of [their] employment or official responsibilities" or "[with] malicious purpose, in bad faith, or in a wanton or reckless manner." Ohio Rev. Code § 2744.03(A)(6).[22]

Here, the Court has already determined that Lieutenant Longbons' failure to completely fill out Mr. Wiertella's medical intake form and alert medical staff to his conditions, knowing the form would be reviewed by a nurse, was, "at most[,] negligent conduct." *Brawner*, 14 F.4th at 600; *Graham ex rel. Est. of Graham*, 358 F.3d at 384. Accordingly, Plaintiff has offered no argument that Lieutenant Longbons' acts or omissions rise to the level of "malicious purpose, in bad faith or in a wanton or reckless manner." Ohio Rev. Code § 2744.03(A)(6). *Cf. Stefan v. Olson*, 497 F. App'x 568, 580-81 (6th Cir. 2012) (noting similarities between the Eighth Amendment "deliberate indifference" standard and Ohio's "wanton or reckless manner" standard). Nor has Plaintiff contended that Lieutenant Longbons was acting "outside the scope of [his] employment or official responsibilities." Ohio Rev. Code § 2744.03(A)(6).

---

[22] "Malice" is the "willful and intentional design to injure or harm another, usually seriously, through conduct that is unlawful or unjustified." *Otero v. Wood*, 316 F. Supp. 2d 612, 629 (S.D. Ohio 2004) (quotations and citations omitted). "Bad Faith includes a dishonest purpose, conscious wrongdoing, or breach of a known duty through some ulterior motive." *Id.* (quotations and citations omitted). "[R]ecklessness is conduct characterized by the conscious disregard of or indifference to a known or obvious risk of harm to another that is unreasonable under the circumstances and is substantially greater than negligent conduct." *Hopper v. Phil Plummer*, 887 F.3d 744, 759 (6th Cir. 2018) (quotations and citations omitted). "Wanton misconduct is the failure to exercise any care toward those to who a duty of care is owed in circumstances in which there is great probability that harm will result." *Anderson v. Massillon*, 983 N.E.2d 266, 273 (Ohio 2012).

Accordingly, summary judgment in favor of the Lake County Defendants on the state law claims for negligence and wrongful death is warranted.

**VI.**      <u>**Conclusion**</u>

For the reasons stated above, Dr. Raz's motion for summary judgment (Doc. No. 48) is GRANTED.  The Lake County Defendants' motion for summary judgment (Doc. No. 57) is GRANTED IN PART and DENIED IN PART.

      **IT IS SO ORDERED.**


**Date:** March 26, 2024

_____
BRIDGET MEEHAN BRENNAN
UNITED STATES DISTRICT JUDGE